UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRUSTEES OF THE SUBURBAN TEAMSTERS OF NORTHERN ILLINOIS WELFARE AND PENSION FUNDS, | |
| Plaintiffs, | No. 16 CV 9433 |
| v. | Judge Manish S. Shah |
| TMR SERVICES, INC., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

The Trustees of the Suburban Teamsters of Northern Illinois Welfare and Pension Funds bring this action against TMR Services under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1132 *et seq.*, for delinquent fringe-benefit contributions. The parties filed cross-motions for summary judgment. For the following reasons, plaintiffs' motion for summary judgment is granted, and defendant's motion for summary judgment is denied.

**I. Legal Standards**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986). A court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018). On cross-motions for summary judgment, a court must draw inferences "in favor of the party against whom the motion under consideration was made." *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) (citation omitted). "Cross-motions must be evaluated together, and the court may not grant summary judgment for either side unless the admissible evidence as a whole—from both motions—establishes that no material facts are in dispute." *Bloodworth v. Vill. of Greendale*, 475 Fed. App'x 92, 95 (7th Cir. 2012).

## II. Background

Martin Rodin was the president and sole shareholder of TMR, an Illinois corporation that provided trucking services. [35] ¶ 5; [45] ¶¶ 3, 6.[1] On June 25, 2014, TMR signed a Memorandum of Agreement with the teamsters' union, in which TMR agreed to be bound by a collective bargaining agreement, effective from June 1, 2012 through May 31, 2017. [45] ¶¶ 13–14. The agreement obligated TMR to pay monthly fringe-benefit contributions to the funds on behalf of covered employees. *Id.* ¶ 15. The union, under the agreement, also had the right to inspect and to audit TMR's payroll records. [35] ¶ 10.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are largely taken from TMR's responses to the Trustees' Local Rule 56.1(a) statements, [35], and the Trustees' responses to TMR's Local Rule 56.1(a) statements, [45], where both the asserted fact and the opposing party's response are set forth in one document. When the parties raised arguments in their statements, included additional facts in their responses or replies, failed to support their statements by admissible evidence, or failed to cite to supporting material in the record, I disregarded those portions of those statements, responses, or replies.

2

All of TMR's truck-driving employees, including Rodin, held Illinois commercial drivers' licenses and were represented by the union. [35] ¶ 20; [45] ¶ 5. It was TMR's practice to require its union-member employees to fill out work tickets contemporaneously when they drove for TMR; the work tickets identified: (1) the employee's name, (2) the date the employee performed the work, (3) the name of the contractor or project for which the employee performed the work, (4) the number of hours the employee spent driving, and (5) an approval signature from the contractor or the project superintendent. [45] ¶ 9. In accordance with this practice, even though Rodin was the owner and a salaried employee, he filled out work tickets whenever he drove a truck for TMR. *Id.* ¶¶ 7, 10.

Rodin worked six to seven days a week. [25-2] at 6, 17:5–7. Most of the time, though, Rodin was not driving a truck; instead, he served as TMR's office manager, overseeing the company's daily operations. [45] ¶ 7. In his capacity as office manager, Rodin managed TMR's submission of fringe-benefit contributions to the funds. *Id.* For every form that TMR submitted to the union, Rodin signed the following certification: "I certify the above is true and complete reporting of hours, weeks and/or days by employees represented in the Collective Bargaining (or participation) Agreement." [51] ¶ 2. TMR contributed 350 hours' worth of welfare contributions on Rodin's behalf for the month of November 2014 so that Rodin could obtain welfare eligibility, even though he had nothing to support his claims of working these 350 hours. [35] ¶ 18. In order to maintain that welfare eligibility, TMR continued to contribute 100 hours' worth of welfare contributions on Rodin's

3

behalf per month until December 2015.[2] *Id.* ¶ 19. Since it was only possible for TMR to make 160 hours' worth of welfare contributions on Rodin's behalf in the month of November 2014, the 350 hours' worth of contributions for that month raised a red flag. [25-4] at 86, ¶ 9. In December 2015, the funds sent a notification that TMR could no longer contribute on Rodin's behalf on an hourly basis. [35] ¶ 17. Thereafter, TMR stopped making such contributions. *Id.*

The union audited TMR. *Id.* ¶ 21. After reviewing all of TMR's books and records, the union's auditor concluded that TMR owed $16,485.02 in weekly contributions, liquidated damages, and interest on behalf of Rodin for the period May 2014 through December 2015. *Id.* ¶¶ 24, 27; [45] ¶ 24; *see also* [25-4] at 92–94. The audit calculated TMR's liability by assuming that Rodin worked a sufficient amount of time each week to justify the full weekly contribution and multiplying the weekly contribution rate for every week during the audit period[3]; and the audit credited TMR for the welfare contributions it had already paid on Rodin's behalf during the audit period. [25-4] at 92–94. TMR challenged the audit report, asserting that TMR was only obligated to remit weekly fringe-benefit contributions based on the actual amount of covered work Rodin performed during the audit period. [45] ¶ 28; [36-4] ¶¶ 3–6, 10, 19. Rodin says that that his work tickets document the actual hours of truck-driving work he performed during the audit period. [45] ¶ 31;

---

[2] TMR also paid two weeks' worth of pension contributions on Rodin's behalf for each month of the audit period even though that contribution was not based on the work Rodin actually performed. [25-2] at 12, 40:16–41:2.

[3] Rodin asserted that he worked six to seven days a week, every week. *See* [25-2] at 6, 17:5–7; *id.* at 9, 27:16–20.

*see also* [25-2] at 6, 15:10–16:22; *id.* at 7–8, 18:1–25:19; *id.* at 9, 27:1–28:23; [36-5] ¶ 7. Beyond those tickets, however, TMR concedes that it does not have any records of Rodin's hours when he was not performing covered work. [35] ¶ 25; [51] ¶ 17.

The Trustees, as fiduciaries of the funds, [35] ¶ 3, bring this collection action for payment of TMR's delinquent contributions. They seek $16,485.02 in health and welfare and pension contributions, 10% liquidated damages on late and unpaid amounts, and interest. [26] at 10.

**III. Analysis**

The Trustees move for summary judgment, arguing that TMR was required to make contributions to the funds for all the work Rodin performed, regardless of whether it was covered or non-covered work. [26] at 5 (citing *McCleskey v. DLF Const., Inc.*, 689 F.3d 677 (7th Cir. 2012)). The Trustees assert, as a general rule, that employers must make fringe-benefit contributions on its employees' behalves for both covered and non-covered work. [43] at 6–7 (citing *Laborers' Pension Fund v. C.A. Sementa Contractors, Inc.*, 82 C 4028 (N.D. Ill. Oct. 26, 1983)). TMR disagrees and it argues that *McCleskey* is distinguishable because that case turned on the interpretation of an agreement with hourly reporting obligations unlike the agreement involved in this case. [33] at 9 (citing *McCleskey*, 689 F.3d at 679).

*McCleskey* and *Sementa* do not state a general proposition; rather, each court analyzed the relevant agreement and applied the force of that language to the facts in each case. While it is clear from *McCleskey* that the Seventh Circuit permits a finding that an employer must make fringe-benefit contributions for covered and non-covered work, that does not compel the same conclusion here. District court

5

decisions like *Sementa* are merely persuasive authority; their holdings are not binding on this court. Thus, the task at hand is to determine the meaning of the agreement and then to decide whether TMR complied with its obligations.

Here, parties have differing interpretations of the agreement. The Trustees argue that the agreement requires TMR to make weekly contributions for Rodin's benefit because Rodin is an owner and not a regular employee. [26] at 6; [43] at 5. By contrast, TMR argues that the agreement bases an employer's contribution obligation on the manner in which the employee is compensated. [33] at 7. TMR does not believe it had to remit weekly contributions on Rodin's behalf if Rodin did not perform covered work during that week. *Id.* at 6, 8. Furthermore, it argues that for weeks when Rodin performed covered work, the agreement prorates TMR's contribution according to the number of days that Rodin drove a truck for TMR (25% per day with a cap of four days). *Id.* at 9. To support this reading of the agreement, TMR points to the "limiting language" in Articles 9.1(a)(ii) and 10.1(a), which TMR views as evidence that the agreement contemplated that an owner of a contributing employer may perform covered and non-covered work in a given week. *Id.* at 8. The agreement states, in relevant part:

> 9.1 (a)(i) Effective June 1, 2012, the Employer shall pay the sum of $7.25 per hour, on all hours worked, *for each regular employee* covered by this Agreement into a trust fund set up by the Trust Agreement now in effect in the aforementioned Union Local for the payment of Health and Welfare benefits as determined by a Board of Trustees. . . .
>
> 9.1 (a)(ii) Effective June 1, 2012, the Employer shall pay the sum of $300.00 per week, *if the participant . . . own[s] a majority interest in the participant's employer* . . . . The Employer shall

6

pay the required contribution for any regular employee covered by this section who performs work on any two (2) calendar days in such week into a trust fund set up by the Trust Agreement now in effect in the aforementioned Union Local for the payment of Health and Welfare benefits as determined by a Board of Trustees. . . .

10.1 (a) Effective June 1, 2012 thru May 31, 2014, the Employer shall pay the base rate sum of one hundred eighty-nine dollars ($189.00), plus applicable RPS and MS, per week per employee into a Trust Fund for the purpose of providing pension benefits to employees covered by this Agreement.

Effective June 1, 2014, the Employer shall pay the base rate sum of one hundred eighty-nine dollars ($189.00), plus applicable RPS and MS$^+$, for a pension contribution total of two hundred fifty-two dollars and eighty-five cents ($252.85) per week per employee into a Trust Fund for the purpose of providing pension benefits to employees covered by this Agreement. . . .

A calendar week is Sunday through Saturday. Starting with the first worked day of the week, the Employer will pay 25% of the weekly contribution for each day the employee worked, with a cap of four (4) days.[4]

Comparing Article 9.1(a)'s subparagraphs (i) and (ii), which have a parallel structure, makes clear that this section of the agreement distinguishes between regular employees and participant-owners. Employers make contributions for regular employees on an hourly basis; but, employers make contributions for participant-owners on a weekly basis. As the Trustees point out, this distinction also appears in the "Summary Plan Description For Benefits in Effect November 1, 2009" which explains: "If you are an owner-operator and you are working in covered employment, your collective bargaining agreement should provide for weekly

---

[4] *See* [25-2] at 41–44.

contributions, rather than hourly contributions, so that you remain in your current weekly-rate class." [43] at 4 (citing [44] at 14). It further explains that an individual qualifies as an "owner-operator" is he owns a majority interest in his employer.[5] [44] at 14. Based on the undisputed facts, Rodin falls into the category of participant-owner when referring to the agreement and the category of owner-operator when referring to the summary plan.

Adding further detail to this distinction, subparagraph (i) requires employers to make contributions for regular employees "on all hours worked." By contrast, subparagraph (ii) requires the employer to "pay the required contribution for any regular employee covered by this section who performs work on any two (2) calendar days in such week." The reference in subparagraph (ii) in this sentence to "any regular employee" is confusing—the first sentence of the subparagraph concerns only participant-owners. Taking into account the context of Article 9 as a whole, subparagraph (ii) requires employers to make contributions on an employee's behalf only when that employee worked two days in a given week. When an employee—regular or participant-owner—works one or less days in a given week, the employer is not obligated to make contributions on the employee's behalf. When the employee works for two or more days in a given week, the employer's contribution for health and welfare benefits is on all hours worked if the employee is a regular employee, and it is set at a weekly rate if the employee is a participant-owner.

---

[5] TMR acknowledges that this document also bears on the parties' obligations. *See, e.g.*, [51] ¶¶ 6–8.

Article 10 of the agreement consistently refers to employees in a general sense and it only contemplates contributions for pension benefits on a weekly basis. Even though Article 10 measures contributions on a weekly basis, it prorates an employer's contribution obligation based on the number of days an employee works in a given week—"the Employer will pay 25% of the weekly contribution for each day the employee worked, with a cap of four (4) days."

There is nothing in the language of Article 9 or Article 10 to support a finding that employers are only obligated to make contributions when the employees performed covered work. TMR's citation to Article 1.4, which details "Work Covered" for jurisdictional purposes, does not change my conclusion. *See* [36-6] at 6–7. Indeed, as Article 1.5 explains, "The work listed in Section 1.4 above is listed for the purpose of describing work customarily and / or traditionally performed by the employees covered by this Agreement, and for no other purpose." *Id.* at 7. The performance of covered work triggers coverage under the agreement; it does not limit the amount of contributions owed for that coverage. As a result, TMR should not have made contributions for Rodin on an hourly basis only for his truck driving. For Article 9, TMR owed a contribution, at a weekly rate, anytime Rodin worked at least two days in a given week. For Article 10, TMR owed a contribution, measured as a percentage of a set weekly rate, for each day, up to four days, that Rodin worked in a given week.

ERISA requires employers to keep records of its employees' hours in order to permit the calculation of benefits. 29 U.S.C. § 1059(a)(1); *Ill. Conference of*

9

*Teamsters and Employers Welfare Fund v. Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995). When an employer has not kept adequate records, courts presume that the auditor's calculations are correct and they shift the burden to the employer to rebut the presumption. *Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 264 (7th Cir. 2003). Under this burden-shifting approach, the Trustees must show that TMR is liable for delinquent contributions and that TMR failed to keep adequate records, thereby making it impossible to calculate the precise amount of contributions owed. *Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 782 (7th Cir. 2002). The burden then shifts to TMR to present evidence of the precise amount of work or to challenge the accuracy of the Trustees' calculations. *Id.* at 782–83. If TMR cannot carry its burden, then the Trustees' audit report sets the amount of the delinquency. *Id.* at 783.

The Trustees argue that the court should presume that the audit report is accurate because TMR kept insufficient records. [26] at 6. They point to TMR's admission that beyond the twenty-four work tickets, there are no other records to show what work Rodin performed during the audit period. *Id.* at 8; *see also* [35] ¶ 25; [51] ¶ 17. TMR disputes that its records are deficient because it maintained daily payroll records of its hourly employees per the agreement, and because TMR was not required to keep hourly records for Rodin, who was a salaried owner-employee. [33] at 11–12 (citing 29 U.S.C. § 1059(a)(1); *Reinke*, 347 F.3d at 264). To support its point, TMR cites Article 26, Section 26.2 of the agreement, which states:

"Employers shall keep a permanent daily payroll record of all employees and of hours worked by employees on a time basis showing starting and quitting time." [33] at 12; *see also* [45] ¶ 22. TMR argues that the agreement does not specify what form the daily payroll record must take and that its work tickets comply with this requirement.

As rebuttal evidence, TMR presents Rodin's twenty-four work tickets and Rodin's sworn testimony that those work tickets accurately represent all of the times he drove a truck for TMR during the audit period. TMR argues that this evidence is enough to rebut the presumption that the audit report is accurate, and it notes that other courts in this district have found documents like the work tickets to be reliable challenges to an employer's audit. [33] at 10 (citing *Reinke*, 347 F.3d at 265). I agree that these work tickets are reliable in the sense that they are contemporaneous records of the time Rodin spent driving a truck, *see Reinke*, 347 F.3d at 264, but because TMR has no records for Rodin's other work, it cannot challenge the accuracy of the vast majority of the time that factored into the audit's calculation—the days Rodin spent performing non-covered work.

In any event, the evidence of when Rodin drove a truck for TMR would only reduce the damages calculation if I had agreed with TMR that the agreement only obligates an employer to make contributions for covered work. Given that I reached the opposite conclusion, and given Rodin's testimony that he worked six to seven days a week throughout the audit period, evidence of when Rodin performed covered work does not reduce the damages calculation here. The pattern of Rodin's

11

work meant: (1) under Article 9, TMR owed a contribution on his behalf for every week of the audit period; and (2) under Article 10, TMR owed the full contribution for every week during the audit period.

The Trustees are entitled to $16,485.02 in delinquent contributions, liquidated damages, and interest from TMR. The Trustees are directed to submit a proposed judgment order with updated calculations and to file, pursuant to Local Rule 54.3, a petition for attorney's fees and costs.

## IV. Conclusion

Plaintiffs' motion for summary judgment is granted. Defendant's motion for summary judgment is denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: March 20, 2018